# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

JUST DOGS! BARKERY, INC.,     )
               )
       Plaintiff,     )
               )
v.                )     2:05-cv-01327-JEO
               )
RICHARD PARKER d/b/a     )
WWW.JUSTDOGS.COM,     )
               )
       Defendant.     )

## <u>MEMORANDUM OPINION</u>

This matter was commenced when the plaintiff/counter-defendant, JUST DOGS!

BARKERY, INC. (hereinafter "Barkery" or "the plaintiff"), filed a complaint for declaratory

judgment in this court on June 17, 2005.  (Doc. 1).[1]  The defendant/counter-plaintiff, Richard

Parker, doing business as www.justdogs.com (hereinafter "Parker" or "the defendant"), then filed

an answer and counterclaims against Barkery.  (Doc. 19).  The case is now before the court upon

three motions for summary judgment and motions to strike submitted by the defendant.  (Doc.

60, 61, 69, 72 & 76).

## I. PROCEDURAL HISTORY

After the threat of litigation by the defendant over the plaintiff's use of the "Just Dogs!

Gourmet" trademark, the plaintiff filed a complaint for declaratory judgment in this court.  (Doc.

1).  The plaintiff requests that the court declare that its use of the subject trademark does not

constitute trademark infringement (Count One), dilution (Count Two), or unfair competition

under federal or state law (Count Three).  (Doc. 1 at pp. 8-10).  On September 16, 2005, the

---

[1]References made herein to "Doc.___," "Ex. ___," or "at ___" are to the document, exhibit, or page number
assigned by the Clerk of the Court respectively.

defendant answered the plaintiff's complaint and filed his counterclaims.  (Doc. 19).  On October 6, 2005, the defendant amended his counterclaim.  (Doc. 22).  Then, on January 5, 2006, the plaintiff amended its complaint to add a tortious interference with business and contractual relations claim (Count Four).  (Doc. 35).  After an unsuccessful mediation of the claims, the parties filed the present, pending motions.

Specifically, on January 11, 2007, defendant/counter-plaintiff Parker filed a motion for summary judgment seeking a dismissal of the tortious interference with business and contractual relations claim (hereinafter "tortious interference claim") advanced by plaintiff/counter-defendant Barkery.  (Doc. 60).  On January 12, 2007, Barkery filed a motion for summary judgment on its tortious interference claim.  (Doc. 69).  Also, on January 12, 2007, Barkery filed a motion for summary judgment on Parker's counterclaims.  (Doc. 61).

Parker has also moved to strike the affidavits (doc. 69-6 (Ex. D) and 69-9 (Ex. G)) in support of Barkery's motion for summary judgment on its tortious interference claim (doc. 72 at pp. 4-5), and has filed a motion to strike several portions of Barkery's reply to Parker's response to Barkery's motion for summary judgment on Parker's counterclaims.  (Doc. 76).  The court will address all of the motions herein.

## II.  FACTS[2]

In 1998, Parker opened and maintained a pet grooming and retail store in Boothwyn, Pennsylvania.  (Parker Dep. at pp. 16-17).[3]  Parker's store, "Just Dogs," offered dog grooming

---

[2]The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the non-moving party on each motion when they are in dispute.  They are the "'facts' for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)."  *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[3]Parker's deposition is located at document 63-2 through 63-5 (Ex. A) in the court's record of the case.

services and sold dog supplies.[4]  (*Id*. at pp. 34, 99, 150-52).  The majority of Parker's business

was grooming services.  (*Id*. at pp. 19, 31, 58-59).  Parker also sold "barking dog" music compact

discs.  (*Id*. at pp. 208-09).

Parker advertised his business through local publications such as yellow pages, flyers, and

newspapers.  (Parker Dep. at pp. 84-89, 94-95; see also Doc. 64-2 through 64-5 (Ex. E(1) - E(4)).

During its entire operation, net sales from the store never exceeded $6,700 in any one year.  (*Id*.

at pp. 54-61).  In July 2001, Parker closed the retail store.  At that time, Parker began selling the

"barking dog" compact discs on the website "www.justdogs.com."  (*Id*. at pp. 20-21, 89).

Between July 2001 and the time this suit was filed, Parker did not sell or offer for sale

any edible dog products.  (Parker Dep. at p. 74).  In 2001, Parker sold a few "barking dog"

compact discs on the website.  Until 2004, Parker did not have pet products available on his

website.  He now has various breed-specific, non-edible dog merchandise, including t-shirts,

clocks, decorative chalkboards, music compact discs, magnetic memo boards, and plant pots on

his website.[5]  (*Id*. at pp. 112, 122; Doc. 65-2 through 65-6 (Ex. I(1) - I(4b)).  With the exception

of filing a fictitious name certificate in Pennsylvania, Parker has never registered the Just Dogs

name as a service mark, trade mark, or trade name.  (Parker Dep. at pp. 39-43).

Just Dogs! Barkery, Inc., is a retail and wholesale business, founded in 2001 and

incorporated in Nevada with its principal place of business in Alabama.  Barkery manufactures

and offers gourmet dog treats and pet merchandise that are sold through a network of franchises

---

[4]Parker sold dog supplies such as dog food, rawhides, and biscuits.  (Parker Dep. at p. 34).

[5]None of the merchandise, with the exception of the "barking dog" compact discs, contains any trademark, service mark, or logo of the defendant.  Inventory is either drop shipped from an original manufacturer to fill an order or is passed through Parker's home as a re-shipment site to fill orders.  (Parker Dep. at pp. 184-86).

in several states and through the internet.  (Doc. 1 at ¶¶ 1, 7-8).  The business began in

Pennsylvania as a dog treat bakery called "Dogs Rule."[6]  After positive customer reaction,

Barkery founder, president, and CEO Colleen Starnadori decided to test the dog bakery concept

in local malls.  (Starnadori Dep. at p. 15).[7]  She hired a franchising consultant and formed Just

Dogs! Barkery, Inc., which purchased the bakery and its equipment from Dogs Rule.  (Starnadori

Aff. at pp. 17-24).[8]  The first franchise opened in February of 2003, in Birmingham, Alabama.

(Starnadori Dep. at p. 44).  Around that time, the plaintiff learned of a Florida business called

"Dogs Rule."

The plaintiff then changed its business name to "Just Dogs! Barkery."  After filing to

register the "Just Dogs! Barkery" logo with the U.S. Patent and Trademark Office [(USPTO)],

the plaintiff learned that the name "Barkery" had been used and registered with the USPTO since

1998.  The plaintiff then abandoned that trademark application.[9]

The plaintiff then began using the "Just Dogs! Gourmet" name in February 2004.[10]

---

[6]Dogs Rule, LLC, is still in existence today in Pennsylvania and is a dog grooming business.  (Starnadori Dep. at pp. 17, 23).

[7]Starnadori's deposition is located at document 67-5 through 67-6 (Ex. L(a) - L(b)), in this court's record of the case.

[8]Starnadori's affidavit is located at document 69-9 (Ex. G).

[9]Barkery filed its trademark application on March 31, 2003, for the mark "JUST DOGS! BARKERY" for use with goods: "pet food, namely dog biscuits and gourmet edible pet treats."  The USPTO initially refused registration based upon an existing registration owned by Sargent's Pet Foods for the mark "Barkery" under a likelihood of confusion theory.  Barkery contacted Sargent's and asked for a consent for registration or in the alternative to license Sargent's mark, but was refused.  Barkery then changed its trade name and trademark used to "JUST DOGS! GOURMET."  (Kennison Aff. at ¶ 4 (located at Doc. 68-6 (Ex. R))) .

[10]The progression of the business name from Dogs Rule to Just Dogs! Gourmet is confusing, to say the least.  Suffice it to say that the business started as Dogs Rule, was at some point called Dogs Rule Barkery, then Just Dogs! Barkery, and now Just Dogs! Gourmet.  The exact time line of the name evolution is unclear and immaterial and fills just about the entire one hundred twenty pages of Starnadori's deposition.  In her words,

What happened was Dogs Rule, somebody was using it in Florida.  Can't use it, scratch it off.
Next thing that came up was Dogs Rule Barkery.  Barkery was being used by Sargents.  Couldn't use it,
scratched it off.  The next thing that came was fill in something for Dogs Rule.  Just Dogs! is what everybody

4

Barkery and its franchisees now use the mark, symbol, logo, name, etc., that reads "Just Dogs! Gourmet." (Doc. 1 at ¶¶ 10, 12-13). Barkery filed "intent to use" and "use in commerce" applications for the name and logo of "Just Dogs! Gourmet" with the USPTO on March 4, 2004, and July 14, 2004, respectively. (Doc. 1 at ¶ 13; Doc. 1-4 (Ex. C)). Both were filed with descriptions of "pet food, namely dog biscuits and gourmet edible pet treats." Both applications have been allowed and published, but are suspended pending disposition of Parker's oppositions. The appearance of the current mark is identical to the original "Barkery" mark except for the substitution of the word "Barkery" with the word "Gourmet." The goods with which each mark is used are the same. (See Doc. 67-7 (Ex. M)).

Prior to adoption of the Just Dogs! Gourmet Mark, neither Barkery founder, president, and CEO Starnadori nor its Vice President Mark Kennison had any knowledge of Parker, his store, or his website. (Starnadori Dep. at pp. 68, 74-75, 111; Kennison Del. at ¶ 6).[11]

Barkery sells gourmet dog treats through a network of franchises. Its baking operation is in Washington, Pennsylvania. Treats are designed and prepared there and sent out to the individual stores. The dog treats are only sold through the franchise network locations, which are in mall kiosk carts, free standing buildings, and mall stores. All consumers of Barkery products purchase their products through a retail location.[12]  (Doc. 68-2 (Ex. N) and 68-3 (Ex. O)).

---

voted on. It fit in, like I said - it was two words. It fit into the logo, the look, our paw print, everything we were about. Did a search on that and nothing came up and went with it and added gourmet because that's what we are. It's that simple, so I don't understand what you're asking me.

(Starnadori Dep. at pp. 119-20).

[11]Mark Kennison is an independent consultant for the pet industry who has been affiliated with Barkery since 2001. As of January 2007, he is the Vice President of Barkery. His affidavit is located at document 68-6 (Ex. R).

[12]At some point, some of Barkery's products were available online.

5

Barkery has sold over 46 franchises throughout the United States.  (Doc. 68-4 (Ex. P)).

Each franchisee operates under a detailed franchise agreement in which Barkery retains all

prosecution rights for trademark infringers and retains all good will associated with the Just

Dogs! Gourmet mark.  (Kennison Aff. at ¶ 9).  Total franchise sales for Just Dogs! Gourmet in

2005 amounted to $1,122,453 and store sales exceeded $4.0 million nationwide.  (*Id*. at ¶ 10).

Sixty percent of Barkery's total franchise revenue comes from the sale of dog treats.  (*Id*. at p.

42).

Each franchise conducts its own advertising and the Barkery corporation encourages the

franchisees to undertake extensive advertising activities in their local areas to build up good will

in the trade name of the company.  (Kennison Aff. at ¶ 11).  Franchise and corporate advertising

activities include, but are not limited to: newspaper advertising, magazine advertising, ad flyers,

radio advertising, nationwide TV interviews, internet franchise offering, franchise location

signage, direct mail outs, table tent cards at eating and meeting tables in associated mall

locations, Frequent Barker's Club memberships, doggie treat cooking demonstrations, puppy

showers, dog birthday parties, pampered pooch events, dog fashion shows, mailed discount

coupons, mobile advertising on cars, fund raisers, and doggie treat giveaways.  (*Id*. at ¶ 11).  The

individual retail stores spend an average of $20,000 to advertise their grand openings.  (*Id*. at ¶

12).

On December 28, 2004, the Today Show aired a segment on the Barkery and its franchise

opportunities.  After that segment, Parker received numerous email inquiries from potential

Barkery franchisees, inadvertently requesting from him, rather than Barkery, franchise purchase

information.  (Doc. 69-2 through 69-3 (Ex. A (Parts I & II))).  After receiving the email inquiries,

counsel for Parker sent letters directly to Barkery's franchise locations threatening the respective franchisees with potential litigation for their use of Just Dogs' trademarks and logos.[13]  (June 7, 2005 letter).[14]  After that and subsequent to the filing of this lawsuit, Parker sent letters directly to Barkery's franchise locations, again threatening the respective franchises with potential litigation for their use of the Just Dogs' trademarks and logos.[15]  (November 2005 letter).[16]  At the same

---

[13]The text of the letter, in pertinent part, is as follows:

I represent Richard Parker of Boothwyn, Pennsylvania in trademark and intellectual property matters.  Mr. Parker has used the trademark JUST DOGS nationally since at least 1999 to promote and advertise the sale of dog and pet items.  Mr. Parker has invested considerable amounts of time and money to create consumer recognition of the brand name and trademark JUST DOGS and has received publicity from television and radio programs as well as numerous printed publications such as *Dog World*, *WOLF! Magazine*, and *Animal Fair*.  In addition, Mr. Parker has operated a pet supply website at www.justdogs.com since 1996.  As a result of these investments, my client must protect his trademark against infringement and dilution.

It has recently come to our attention that you are operating a store called JUST DOGS! GOURMET featuring dog treats and products for dogs.  Your use of this phrase is very likely to confuse potential customers.  As a result of Mr. Parker's earlier use of the phrase JUST DOGS for goods and services which are virtually identical to those goods and services sold under the JUST DOGS! GOURMET name, your use constitutes federal trademark infringement and unfair competition under Section 43(a) of the Lanham Act, 5 U.S.C. § 1125(a), as well as unfair competition under state law.

Accordingly, we demand that you (a) cease and desist all current and future use of the phrase JUST DOGS! GOURMET or anything confusingly similar thereto and (b) provide a detailed accounting of sales and profits at your store(s) since 2003.

If we do not receive communication from you within ten (10) days containing said accounting and confirming your intent to abandon use of JUST DOGS! GOURMET name, I will advise my client to take the necessary legal steps to protect its intellectual property rights, including the filing of Notices of Opposition to the Just Dogs! Barkery, Inc. trademarks in the U.S. Patent and Trademark Office and an injunction to prevent you from continuing to use the infringing name.  In the alternative, to reach an amicable resolution of this matter, your store can license the name from Mr. Parker at a cost of $15,000 per year for each present and future location.

(Doc. 69-4 (Ex. B)).

[14]Examples of the June 7, 2005 letter are located at document 69-4 (Ex. B).

[15]The text of the letter is as follows:

My name is Rich Parker, founder and owner of Just Dogs℠ and justdogs.com℠, and I am taking this unusual step to contact you personally in an effort to resolve the matter of my trademark as quickly and fairly as possible.

As you should be aware, Just Dogs! Barkery (the "Barkery") has been infringing on my trademark rights by using a name, Just Dogs! Gourmet, which is very similar to that of my business, Just Dogs.℠

My attorney and I contacted Just Dogs! Barkery to try to reach a reasonable resolution, but the Barkery chose to file a lawsuit against me and my business in federal court in Alabama, in an attempt for the court to grant

time, Parker posted a similar letter on his website, www.justdogs.com, with the heading

"Important information regarding Just Dogs! Gourmet and Just Dogs! Barkery, Inc.!  Click

Here."  (Doc. 69-7 (Ex. E)).  The website link then took the reader to the above-referenced letter

containing the heading "Don't buy a franchise from Just Dogs! Gourmet!"  (Doc. 69-8 (Ex. F)).

    One of the franchisees that received Parker's letters was David Bernarducci.  Bernarducci

is the chief operating officer as well as a franchisee of Barkery.  (Bernarducci Aff. at ¶ 1).[17]

According to Bernarducci, at the time he received Parker's letters, he was negotiating with

Barkery to purchase franchise rights for five additional franchise locations throughout the State

of New Jersey.  (Starnadori Aff. at ¶¶ 2-4; Bernarducci Aff. at ¶¶ 1-3).  Franchise fees for five

locations would have totaled approximately $73,125.  (Starnadori Aff. at ¶¶ 3-4; Bernarducci

Aff. at ¶ 5).  After receiving Parker's letters and being aware of the posting on Parker's website,

---

them continued use of my trademark.  So I had no choice but to file a counter-suit to protect my trademark rights.  The Barkery has a history of trademark issues.  This time the ramifications of the Barkery's actions may be far more devastating to them and all their franchises, if I prevail in court.

If I prevail at the upcoming trial, the Barkery along with its franchises will lose the right to use my JUST DOGS TRADEMARK altogether and be forced to pay punitive damages and you will lose your investment and hard earned, sweat equity for using my trademark.  If the matters are not settled before trial, it will be a judge or jury making the ultimate determination.

I have also filed to block the Barkery's applications for trademark registration in the United States Patent and Trademark Office since I was using the name Just Dogs℠ first and the Barkery may be prevented from registering a similar name.  You should also know that the Barkery's attorneys have claimed that they represent you and in the past they have sought to stop me from communicating with you.  Allowing the Barkery's attorneys to continue as they are will only escalate this litigation.  They will not prevail in their efforts to contain this litigation in the state of Alabama.

I am prepared to avoid a long and contentious dispute by licensing the rights to Just Dogs℠ trademark to each store operator for a reasonable annual fee.  If you too are interested in a good-natured resolution, I am available to talk with you individually on a  conference call with counsel.  I believe it would be the best interest for all of us to do so, regardless of what the Barkery is telling you about this litigation.

(Doc. 69-5 (Ex. C)).

[16]Examples of the November 2005 letter are located at document 69-5 (Ex. C).

[17]Bernarducci's affidavit is located at document 69-6 (Ex. D).

Bernarducci decided not to purchase the five additional franchises for fear of being sued by Parker. (Bernarducci Aff. at ¶ 7).

## III. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided by trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The nonmoving party

need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings.  *Id*.

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  "[T]he judges's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

### B.  MOTIONS TO STRIKE

The defendant filed a motion to strike portions of the plaintiff's reply (doc. 74) to the defendant's response to the plaintiff's motion for summary judgment.  (Doc. 76).  The motion amounts to nothing more than the defendant's attempt to dispute the plaintiff's characterization of facts in its reply.  The court will examine the facts under the appropriate standard.  Therefore, the motion is due to be denied.

Also, embedded within the defendant's response to the plaintiff's motion for summary judgment on its (the plaintiff's) tortious interference claim, the defendant

> requests that the [plaintiff's] evidence [of damages], namely the affidavits of
> Bernarducci and Starnadori attached as Exhibits D & G to Plaintiff's motion, be
> stricken from the record.  Defendant has not been given the opportunity to review
> this evidence prior to the filing of the Motion for Summary Judgment, or to
> submit interrogatory questions . . . because the defendant failed to provide any
> such evidence by the required discovery obligations . . . Furthermore, the alleged
> evidence of damages consists primarily of the affidavit of a clearly interested
> party, namely an Officer of Plaintiff's corporation.  Plaintiff has provided no
> tangible or physical evidence to support the statements contained in the affidavit.

10

(Doc. 72 at pp. 4-5).  Parker also asserts that

>  Bernarducci is not solely a third-party franchisee, but is actually the Chief
>  Opperating [sic] Officer of the Plaintiff's corporation.  [ ]  All statements by
>  Bernarducci are therefore suspect and colored with a clear duty to and benefit to
>  Plaintiff.

(Doc. 72 at p. 2) (citation omitted).  Determinations as to the credibility of the affiants are

generally not appropriate for summary judgment determinations unless there is an allegation that

the affidavit is a sham.  The Court of Appeals for the Eleventh Circuit has elaborated on this

concept as follows:

>  Issues concerning the credibility of witnesses and weight of the evidence
>  are questions of fact which require resolution by the trier of fact.  An affidavit
>  may only be disregarded as a sham when a party has given clear answers to
>  unambiguous questions which negate the existence of any genuine issue of
>  material fact and that party attempts thereafter to create such an issue with an
>  affidavit that merely contradicts, without explanation, previously given clear
>  testimony.  Every discrepancy contained in an affidavit does not justify a district
>  court's refusal to give credence to such evidence.  [ ]  In light of the jury's role in
>  resolving questions of credibility, a district court should not reject the content of
>  an affidavit even if it is at odds with statements made in an early deposition.

*Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) (internal citations omitted).

Parker fails to direct the court's attention to those portions of, or statements contained in,

Bernarducci's affidavit which he believes contradict the quoted excerpts.  (Doc. 72 at p. 3).

Without any reference to a specific portion of, or statement contained in, Bernarducci's affidavit,

any attempt by this court to surmise a contradiction between the quoted excerpts and

Bernarducci's affidavit would be pure speculation.  The motion is therefore due to be denied.

Affidavits submitted in opposition to a motion for summary judgment may be stricken if

they do not meet the requirements of FED. R. CIV. P. 56(e).  The United States District Court for

the Middle District of Alabama has articulated this concept as follows:

Federal Rule of Civil Procedure 56(e) makes it plain that affidavits submitted in opposition to a motion for summary judgment . . . shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall affirmatively show that the affiant is competent to testify to the matters stated therein. FED. R. CIV. P. 56(e). The requirements of Rule 56 make it plain that affidavits which set forth conclusory arguments rather than statements of fact based on personal knowledge are improper. *See, e.g., Story v. Sunshine Foliage World, Inc.*, 120 F. Supp. 2d 1027, 1030 (M.D. Fla. 2000). *Accord, Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000). Affidavits which fail to meet the standards set forth in Rule 56(e) may be subject to a motion to strike. *Givhan v. Electronic Eng'rs, Inc.*, 4 F. Supp. 2d 1331, 1334 (M.D. Ala. 1998). However, if an affidavit contains some improper material, the court need not strike the entire affidavit, rather it may strike or disregard the improper portions and consider the remainder of the affidavit. *Id.* at p. 1334 n.2.

*Hawthorne v. Sears Termite & Pest Control, Inc.*, 309 F. Supp. 2d 1318, 1334 (M.D. Ala. 2003).

That court has further stated:

An affidavit which fails to meet the standards of Rule 56(e) of the Federal Rules of Civil Procedure is subject to a motion to strike. *Southern Concrete Co. v. United States Steel Corp.*, 394 F. Supp. 362, 380 (N.D. Ga. 1975), *aff'd*, 535 F.2d 313 (5th Cir. 1976). The motion to strike should state precisely the portions of the affidavit to which objection is being made, and the grounds therefor. *Id.*; *Olympic Ins. Co. v. H.D. Harrison. Inc.*, 418 F.2d 669, 670 (5th Cir. 1969). If no objection is made to inadmissible statements in an affidavit then the court may consider them on a motion for summary judgment. *Harrison*, 418 F.2d at 670; *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639 (2d Cir. 1988).

*Givhan*, 4 F. Supp. 2d at 1334.

The grounds in support of a motion to strike must include at least one of the following allegations: (1) the affidavits constitute "sham" affidavits; (2) the affidavits were not "made on personal knowledge;" (3) the affidavits did not "set forth such facts as would be admissible in evidence;" or (4) the affidavits do not "affirmatively show that the affiant is competent to testify to the matters stated therein." *Tippens*, 805 F.2d at 954; *Hawthorne*, 309 F. Supp. 2d at 1334.

Parker has failed to show any grounds for striking the affidavits of Bernarducci and

12

Starnadori.  Untimeliness, failure to respond to discovery, and bias of the affiant (doc. 72 at pp. 4-5) do not constitute any of the recognized grounds for striking an affidavit.  Therefore, Parker's request to strike the affidavits of Bernarducci and Starnadori is due to be denied.[18]

### C.  TORTIOUS INTERFERENCE CLAIM

Barkery asserts that it has been injured by the defendant's intentional and willful interference with its business relations.  (Doc. 70).  In fact, Barkery attributes Parker's letters sent directly to its franchise locations regarding potential litigation, as well as the letter posted on Parker's website, to its financial harm.  Specifically, Barkery asserts that Parker's letters caused it to lose at least five franchisees.  (Doc. 70 at pp. 8-9).  Parker, however, argues that the letters he sent only discuss the existence of the proceedings in this court and the possibility of a settlement. He also argues that the plaintiff has not shown any specific injury or damages resulting therefrom.  (Doc. 60 at p. 2).

To establish a cause of action for tortious interference with business or contractual relations, a plaintiff must prove: (1) the existence of a contract or business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; and (4) damage to the plaintiff as a result of the interference.  *Serra Chevrolet, Inc. v. Edwards Chevrolet, Inc.*, 850 So. 2d 259, 265 (Ala. 2002). Additionally, the plaintiff must show that the defendant is not a party to the business relationship. *BellSouth Mobility, Inc. v Cellulink, Inc.*, 814 So. 2d 203, 211-12 (Ala. 2001).  The parties do not dispute that Barkery had a franchisor/franchisee relationship with several franchisees, including

---

[18]The court also notes that to the extent that Parker's request to strike the affidavits of Bernarducci and Starnadori constitutes a motion to strike, such a motion failed to comply with this court's Uniform Initial Order Governing All Further Proceedings.  (Doc. 20, § IV(B) at p. 9).

Dave Bernarducci, which were known to the defendant.  However, the parties do dispute whether the letters sent by Parker and his counsel to Barkery's franchisees (doc. 69, at Ex. 3 & 4), and the letter posted on Parker's website (*id*. at Ex. 7) constitute intentional interference by Parker with the business and contractual relations between Barkery and Bernarducci and/or its other franchisees (doc. 60 at pp. 3-6; doc. 70 at pp. 3-4, 7-9; doc. 72 at pp. 2, 4) and whether the letters caused an injury or damages to Barkery.  (Doc. 60 at pp. 4-7; Doc. 70 at pp. 4-5, 9-10; Doc. 72 at pp. 2, 4-6).

### 1.   Intentional Interference with the Contract or Business Relation

Barkery has made "a sufficient showing" by presenting the affidavits of Bernarducci and Starnadori to substantiate the occurrence of actual interference.  (Doc. 69-6 (Ex. D) and 69-9 (Ex. G)).   In its response to Parker's motion for summary judgment, Barkery states that, "[i]n 2005, during the pendency of this case, Just Dogs entered into negotiations with Dave Bernarducci, who had expressed serious interest in purchasing franchise rights for five (5) franchise locations throughout the State of New Jersey."  (Doc. 70 at ¶ 5).  In support of this contention, Barkery referred to Bernarducci's affidavit, which states, in relevant part:

> In the spring of 2005, I was engaged in extensive, ongoing negotiations with Just Dogs! Gourmet for the purchase of multiple franchises.  I was negotiating with Mark Kennison and Colleen Starnadori of Just Dogs.  I also had some dealings with Robert Needham who is no longer with the company.
>
> . . . .
>
> I also negotiated with the Company and acquired an exclusive arrangement in for [sic] the New Jersey territory to open 5 additional stores in New Jersey malls.  I had hoped to open 6 stores total pursuant to the exclusive option agreement within 1 year of the initial store opening in April of 2005.

(Doc. 69-6 (Ex. D) at ¶ 2, 4).  Barkery also supported this assertion with Starnadori's affidavit,

which states, in relevant part:

> In the spring of 2005, I was aware of the ongoing negotiations with David Bernarducci, who wanted to purchase a [Just Dogs] franchise[s].
>
> . . . .
>
> Mr. Bernarducci also negotiated and obtained from us an exclusive option arrangement to purchase up to 5 additional franchises in the New Jersey area.

(Doc. 69-9 (Ex. G) at ¶¶ 2-3).

These affidavits show that Barkery's business relations with at least one of its franchisees was affected by Parker's actions. Although Parker alleges that his intent was to "communicate with parties who have an interest in the outcome of this proceeding and who may or may not be represented by counsel for Barkery" and to "offer a settlement of these proceedings and attempt to avoid a protracted legal dispute and to avoid unnecessarily taking the resources of this Court," (doc. 60 at p. 4) the undisputed evidence shows that at least one of Barkery's franchisees chose not to further invest in the business for fear of litigation with the defendant. Furthermore, Parker sent the letters to Barkery's franchisees even after the letters from his attorney asserting a right to the "Just Dogs" name. In these letters, Parker made unsubstantiated statements such as "The Barkery has a history of trademark infringement issues. This time the ramifications of the Barkery's actions may be far more devastating to them and all their franchisees if I prevail in court," and "If I prevail at the upcoming trial, the Barkery along with its franchises will lose the right to use my . . . trademark altogether and will be forced to pay punitive damages and you will lose your investment and hard earned sweat equity for using my trademark," that likely were made for the purpose of intimidating the franchisees. (Doc. 69-5 (Ex. C)).

Although Parker states that no evidence exists to support a finding that his intent in

sending the letter was to cause "devastating financial harm" to the plaintiff, the court finds that the plaintiff need not present such evidence.  Instead, the plaintiff need only show that Parker intentionally interfered with the plaintiff's business relations, which it has adequately done. Barkery asserts that "[a]s a direct result of Mr. Parker's written threats and for fear of being sued by Mr. Parker, the potential franchisee decided not to purchase a Barkery franchise." (Doc. 70 at p. 8, § C).  Specifically, Barkery offers the following testimony from the affidavits of Bernarducci and Starnadori:

> Once I received one of his written threat letters, and generally because of his other threatening contacts with other franchisees, I decided not to purchase any additional Just Dogs' franchises.  I did not purchase a Just Dogs' franchise because of Mr. Parker's threats and for fear that if I purchased an additional franchise I might get sued by him.

(Bernarducci Aff. at ¶ 8).

> After receiving a threatening letter from Mr. Parker, and after becoming aware of the threats posted by Mr. Parker on his website www.justdogs.com against our franchisees, Mr. Bernarducci decided to purchase no further Just Dogs franchises.  Mr. Bernarducci told me that he did not want to purchase a Just Dogs franchise because of Mr. Parker's written threats to Just Dogs' franchisees and because his fear of being sued.

(Starnadori Aff. at ¶ 7).  Parker attempts to discredit Bernarducci's testimony because he is an officer of the company.  Although that is true, he is also a franchisee.  Absent evidence refuting Bernarducci's testimony, which the defendant has failed to produce, the court has no basis for discrediting his sworn attestations.

## 2.  Damage to the Plaintiff as a Result of the Interference

In an attempt to show an absence of evidence of damage to the plaintiff, Parker argues as follows:

16

> . . . .  Barkery has introduced no evidence or testimony that the letter
> caused any financial harm to Barkery . . .  [or] that the letter had any impact at all
> on Barkery's business operations.
>
> Barkery has introduced no evidence or testimony to show that Parker's
> webpage or web posting caused any harm to its business.
>
> . . . .
>
> Furthermore, Barkery has failed to demonstrate or to introduce any
> evidence regarding any damages it suffered as a result of the alleged "intentional
> interference."  Even if Parker's actions were considered an intentional interference
> by the Court, Plaintiff has had more than one (1) year since the filing of its
> [amended complaint] to provide evidence of damages and has failed to [do] so.
>
> Barkery has introduced no evidence or testimony to show that Parker's
> actions described in [the amended complaint] . . . had any negative financial
> impact on even a single contract or business relationship of Barkery. . . .
>
> Barkery, despite its Rule 12 obligations and specific discovery requests on
> the subject, has failed to provide any calculation of damages resulting from the
> letter.  Barkery, despite its Rule 12 obligations and specific discovery requests on
> the subject, has failed to provide any evidence supporting its claims [f]or damages
> for Count IV other than the exhibits attached to [Barkery's amended complaint]
> . . . .

(Doc. 60 at pp. 4-7).

Barkery has made "a sufficient showing" through the testimony of Bernarducci and

Starnadori to substantiate its claim that it suffered damages as a result of the defendant's actions.

(Doc. 70 at pp. 6-9).  *Tipton*, 965 F.2d at 998.  In its response to Parker's motion for summary

judgment, Barkery stated that:

> Mr. Bernarducci would have paid [Barkery] approximately $73,125 in
> franchise fees for the five franchise locations.  Also, he would have been required
> to pay Just Dogs a 3% royalty fee of the sales at each franchise location.

(Doc. 70, p. 3 at ¶ 6).  Barkery also demonstrated the following:

> Mr. Parker's actions before and during this lawsuit have damaged [Just

17

Dogs's] franchisees' business, [Just Dogs's] ability to sell franchises, the strength of [Just Dogs's] existing franchise network, and has caused [Just Dogs] financial harm.

(Doc. 70 at ¶ 11).  Barkery also showed:

> As a result of Mr. Parker's willful actions after filing suit, [Just Dogs] lost not only the sale of these five franchise locations, but its business has otherwise suffered financially as well.

(Doc. 70 at p. 9, § C).  Barkery supports this with Starnadori's affidavit:

> The communications from Mr. Parker and his lawyer, including the postings on the website, have damaged our franchisees, about [sic] ability to sell new franchises, and the solidity of our franchise network.
>
> [Barkery] has been hampered in its growth because of these communications by or on behalf of Mr. Parker.
>
> In the past year, [Barkery] has been unable to maintain its expansion rate as a result of the threats made by Mr. Parker.
>
> These threats have scared the franchisees as most of the franchisees are individual owners or small businesses.  They are generally not familiar with legal disputes and the communications from Mr. Parker have frightened them.
>
> The reduction in expansion rate of franchisees has caused monetary harm to [Barkery].

(Starndaori Aff. at ¶¶ 9-13).

Based on the foregoing, the court finds that the plaintiff has clearly demonstrated the element of damages as a matter of law.  The defendant has offered nothing to rebut the same.

### 3.  Parker is a "Third Party" or "Stranger" to the Contract or Relationship

The fact that Parker was a "third party" or "stranger" to Barkery's business relations with its franchisees is undisputed.  Therefore, this element is satisfied.

18

### 4. Conclusion

Because the court finds that the plaintiff has shown that the defendant interfered with its business relations, the plaintiff's motion for summary judgment on its tortious interference claim is due to be granted and the defendant's motion for summary judgment on the same claim is due to be denied.

## D.  THE DEFENDANT'S COUNTERCLAIMS

The defendant's counterclaims are as follows: Count One - Federal Trademark Infringement (15 U.S.C. § 1114); Count Two - Federal Trademark Infringement, False Designation of Origin, and Unfair Competition (15 U.S.C. § 1125); Count Three - Federal Trademark Dilution (15 U.S.C. § 1125(c)); Count Four - State Law Trademark Infringement (ALA. CODE § 8-12-16); Count Five - Common Law Trademark Infringement; Count Six - State Law Trademark Dilution (ALA. CODE § 8-12-17); Count Seven - Deceptive Trade Practices (ALA. CODE § 8-19-1, *et seq.*); and Count Eight - Violation of Anticybersquatting Consumer Protection Act (15 U.S.C. § 1125(d)).  (Doc. 19 at ¶¶ 52-112; Doc. 22 at ¶¶ 113-20).  Although Parker asserts that Barkery's motion for summary judgment in no way makes reference to or includes Counts Four, Seven, or Eight of the amended counter claims, the court disagrees.  (Doc. 71-1).  The plaintiff's motion clearly includes challenges to all the claims and requests relief impacting all of them.  (See Doc. 62).

### 1. Count I of Parker's Counterclaim: Federal Trademark Infringement

Count I of Parker's counterclaim alleges that Barkery's use of the "Just Dogs! Gourmet" mark violates 15 U.S.C. § 1114(1)(a).  *Cf.* Doc. 19, ¶ 67 and 15 U.S.C. § 1114(1)(a).  15 U.S.C. § 1114 states in relevant part:

19

> Any person who shall, without the consent of the registrant . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a).  This court has articulated a prima facie case of trademark infringement in violation of 15 U.S.C. § 1114 as follows:

> Under the Lanham Act, the use of a registered mark in connection with the sale of goods when such use is likely to cause confusion, create mistake or deceive, is prohibited.  15 U.S.C. § 1114.  To prevail on its trademark infringement claim, the plaintiff must establish that (1) its mark has priority and (2) the defendant's mark is likely to cause confusion.

*EBSCO Industries, Inc. v. LMN Enterprises, Inc.*, 89 F. Supp. 2d 1248, 1256 (N.D. Ala. 2000) (citing *Carnival Brand Seafood v. Carnival Brands*, 187 F.3d 1307, 1309 (11th Cir. 1999)).

The court finds that summary judgment on Count I of Parker's counterclaim (doc. 19, ¶¶ 66-71) is due to be granted in favor of Barkery.  In Count I of his counterclaim, Parker contends that Barkery's use of the "Just Dogs! Gourmet" mark violates 15 U.S.C. § 1114.  *Cf.* Doc. 19, ¶ 67 and 15 U.S.C. § 1114(1)(a).  15 U.S.C. § 1114 only protects "registered mark[s]."  *See Two Pesos, Inc. v. Two Cabana, Inc.*, 505 U.S. 763, 767-68 (1992); *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 154 (2d Cir. 2007).  It is undisputed that Parker has not registered the "Just Dogs" mark with the U.S. Patent and Trademark Office.  (Doc. 62 at 11; Doc. 1, ¶ 16; Doc. 19, ¶ 16).  Because Parker has not registered that mark, he cannot seek protection of it under 15 U.S.C. § 1114.  *See Two Pesos, Inc.*, 505 U.S. at 767-68; *ITC Ltd.*, 482 F.3d at 154.  Therefore, summary judgment on Count I is due to be granted in favor of Barkery.

### 2.  Count II of Parker's Counterclaim: Federal Trademark Infringement, False Designation of Origin, and Unfair Competition

Count II of Parker's counterclaim alleges that Barkery's use of the "Just Dogs! Gourmet"

mark violates 15 U.S.C. § 1125.  *Cf.* Doc. 19, ¶ 73 and 15 U.S.C. § 1125.  It states in relevant

part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125.  The Court of Appeals for the Fifth Circuit linked the causes of action for

unfair competition and trademark infringement as follows:

> Unfair competition is a broader area of the law than statutory trademark infringement.  *B. H. Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254 (5th Cir. 1971).  Unfair competition is almost universally regarded as a question of whether the defendant is passing off his goods or services as those of the plaintiff by virtue of substantial similarity between the two, leading to confusion on the part of potential customers.  *Volkswagenwerk Aktiengesellschaft v. Rickard*, 492 F.2d 474, 478 (5th Cir. 1974).  As stated in *American-Marietta Co. v. Krigsman*, 275 F.2d 287 (2d Cir. 1960),
>
> > The whole basis of the law of "unfair competition" . . . is that no one shall sell his goods in such a way as to make it appear that they come from some other source.  The simplest form of this is to use the name or trademark of another, but the law goes further than that.
>
> 275 F.2d at 289.  As a general rule, therefore, the same facts which would support an action for trademark infringement would also support an action for unfair competition.

*Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004,

1010 (5th Cir. 1975).[19]   The Court of Appeals for the Eleventh Circuit has articulated a prima

facie case of trademark infringement and unfair competition in violation of 15 U.S.C. § 1125 as

follows:

> [15 U.S.C. § 1125(a)] forbids unfair trade practices involving infringement
> of trade dress, service marks, or trademarks, even in the absence of federal
> trademark registration. . . .   To prevail under this section, a claimant must show
> (1) that it had prior rights to the mark at issue and (2) that the defendant had
> adopted a mark or name that was the same, or confusingly similar to its mark,
> such that consumers were likely to confuse the two.

*Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir. 2001) (internal

citations omitted).

### a.  Prior Use

In *Planetary Motion, Inc.*, the Eleventh Circuit recognized the following two prong test to

"determine whether a party has established 'prior use' of a mark sufficient to establish

ownership":

> [E]vidence showing, first, adoption, and, second, use in a way sufficiently
> public to identify or distinguish the marked goods in an appropriate segment of
> the public mind as those of the adopter of the mark, is competent to establish
> ownership, even without evidence of actual sales."

*Planetary Motion*, 261 F.3d at 1195 (quoting *New England Duplicating Co. v. Mendes*, 190 F.2d

415, 418 (1st Cir. 1951)).   To determine whether an association exists between the user of the

mark and the marked goods, courts "generally must inquire into the activities surrounding the

prior use of the mark."  *Planetary Motion*, 261 F.3d at 1195.  Parker asserts that

> [c]ommon law rights attach to a trademark based upon use of the mark in

---

[19]"In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), [the Court of Appeals for
the Eleventh Circuit] adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October
1, 1981."  *Henderson v. Washington Nat. Ins. Co.*, 454 F.3d 1278, 1281 n.3 (11th Cir. 2006).

> commerce.  As a result of more than six (6) years of use of the JUST DOGS mark,
> Defendant has established substantial common law trademark rights in the JUST
> DOGS name.  Defendant's use of his JUST DOGS common law trademark has
> been online, and nationwide, since at least January of 1999.  As a result,
> Defendant's common law rights are not in any way limited geographically.

(Doc. 71 at p. 9).  However, the fact that Parker "used" the JUST DOGS mark is not sufficient.

Instead, the court must determine whether he has used the mark to such an extent as to create an

enforceable trademark right at common law.  One method for doing so is to determine whether

he, through public use, has established a zone of goodwill.  *Sweetarts v. Sunline*, 154 U.S.P.Q.

459, 464 (8th Cir. 1967).

Courts have looked at various factors to assess whether a user has established ownership

rights.  Some of those factors are: (1) volume of sales; (2) growth trends; (3) number of buyers in

ratio to potential customers; and (4) amount of advertising.  *See Natural Footwear v. Hart*, 760

F.2d 1383, 225 U.S.P.Q. 1104 (3d Cir. 1985); *followed by Cotton Ginny v. Cotton Gin*, 10

U.S.P.Q. 2d 1108, 1113 (S.D. Fl. 1988); J. Thomas McCarthy, *McCarthy on Trademarks and*

*Unfair Competition* § 26:14 (4th ed. 2006).

Barkery offers charts and invoices (doc. 65-2 through 65-6 (Ex. I(1) - I(4b)); doc. 66-2

through 66-8 (Ex. I(4c) - I(5e))), documenting Parker's sales from 2001 to 2005 for the

proposition that:

> Parker's sales are insufficient to establish a legally cognizable zone of
> penetration, and Parker's limited advertising efforts are insufficient to establish a
> legally cognizable zone of reputation.  Parker's sales of general pet merchandise
> are small, sporadic, and inconsequential to the point of being *de minimis*, and
> sales of edible pet items on his Website are non-existent (Ex. I).  Parker's minimal
> sales are so spread out over both time, years, and geographic extent, more than
> half the country, such that no recognition or presence in any particular area has

23

been established (Ex. I).[20]

. . . .

Parker's website also resulted in no discernable profits (¶¶ 13-14, *supra*) for Parker over the last three years, and those sales are currently declining (Ex. I4-I5).  Such sporadic and inconsequential sales do not establish a zone of penetration anywhere.

. . . .

Parker has conducted no advertising for several years. . . .  Since Parker closed his store in July of 2001 and did not offer any sales of pet goods on his

---

[20]Based upon the charts offered, Parker's internet sales for the years 2001through 2005 were as follows:

| | | |
|---|---|---|
| 2001 | non-music | $0.00 |
| | music | $337.83 |

The 2001 sales were made up of nine buyers from Pennsylvania, France, Ohio, Tennessee, Rhode Island, New York, and Massachusetts.

| | | |
|---|---|---|
| 2002 | non-music | $110.72 |
| | music | $874.60 |

The 2002 sales were made up of ten non-music buyers and thirty-two music buyers from West Virginia, Indiana, Florida, Rhode Island, Arizona, California, Virginia, Connecticut, Iowa, North Carolina, Pennsylvania, Missouri, Ohio, Vermont, Colorado, Illinois, Texas, Canada, New York, Delaware, Arizona, Arkansas, Washington, and Illinois.  The non-music sales consisted of four dog collars, one felt stocking, two hats, one set of reindeer antlers, two t-shirts, and one "southwest design adj."

| | | |
|---|---|---|
| 2003 | non-music | $0.00 |
| | music | $581.70 |

The 2003 sales were made up of twenty-one buyers from Vermont, Pennsylvania, Iowa, Georgia, Arkansas, Texas, California, Nebraska, Colorado, New York, Maryland, Belgium, North Carolina, and New Jersey.

| | | |
|---|---|---|
| 2004 | non-music | $2243.38 |
| | music | $638.59 |

The 2004 sales were made up of one hundred thirty-nine buyers from Connecticut, Massachusetts, Tennessee, Vermont, New York, Georgia, Indiana, Ohio, California, Missouri, Florida, Washington, Colorado, Minnesota, Michigan, Maryland, Idaho, Maine, Kentucky, Alabama, Wisconsin, Texas, Hawaii, Pennsylvania, Iowa, Virginia, West Virginia, Delaware, South Carolina, Oklahoma, Nevada, Nebraska, New Jersey, Illinois, and Arizona.

| | | |
|---|---|---|
| 2005 | non-music | $1052.24 |
| | music | $789.67 |

The 2005 sales were made up of one hundred twenty-four buyers from Connecticut, Pennsylvania, California, Florida, Wisconsin, Texas, Kentucky, Illinois, Virginia, New Hampshire, Michigan, Maryland, Ohio, Missouri, South Carolina, Tennessee, Montana, Kansas, North Carolina, Oklahoma, Georgia, New Jersey, Arkansas, Massachusetts, Minnesota, West Virginia, and New Mexico.  (Doc. 63 at exhibits I-1 through I-5).

website, any reputation established by the prior store's advertising has been lost
due to abandonment.  15 U.S.C. § 1127.

In addition, Parker's use on the Internet of his Mark is not in and of itself
sufficient to establish enforceable common law trademark rights in his Mark.

(Doc. 62 at p. 13).  The most Parker sold in any given state in his best sales year (2004) was

$212.46 in the state of California spread out over 12 cities.  For the aggregate period of 2001

through 2005, the most Parker sold to any one state was $402.16 from twenty-six sales to

California spread over twenty-six cities.[21]

Additionally, Parker's sales are so spread out geographically that the court cannot

conclude that he has penetrated any one market area.  Parker has not conducted any advertising

since 2001 aside from the availability of his products on the internet.[22]  The evidence before the

court indicates that Parker's business amounts to goods sold from his house to purchasers who

order on his website.  Parker does not manufacture or produce any goods (aside from the dog

barking compact discs) but instead either ships items to purchasers from his home (items left

over from his retail store) or arranges for the items to be shipped from the distributor to him so

that he can ship them to the purchaser.  Although the court is aware that "the existence of sales or

lack thereof does not by itself determine whether a user of a mark has established ownership

rights therein," *Planetary Motion, Inc.*, 261 F.3d at 1196, evidence of insubstantial and sporadic

sales (Parker has sold to about 339 individuals out of a potential world-wide buyer base via the

internet) coupled with the lack of advertising and failure to penetrate any particular markets,

---

[21]At the time of his deposition (March 2006), Parker had not reported any income from Just Dogs for the previous three years.  (Parker Dep. at p. 184).

[22]Registration of a domain name is insufficient to constitute "use."  *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1051 (9th Cir. 1999).

preclude the court from concluding that the defendant has established any right in the "Just

Dogs" name.  Although the defendant has clearly used the Just Dogs name, he cannot

monopolize the use of the name in areas where his reputation has not extended.  *See Hanover*

*Star Milling Co. v . Metcalf*, 240 U.S. 403 (1916); *United Drug Co. v. Theodore Rectanus Co.*,

248 U.S. 90 (1918); *Emergency One, Inc. v. Am. Fire Eagle Engine Co.*, 332 F.3d 264, 67

U.S.P.C. 2d 1124, 1127 (4th Cir. 2003).

### b.  Likelihood of Confusion

As stated previously, to show infringement, Parker would both have to show priority of

use <u>and</u> a likelihood of confusion between his mark and Barkery's mark.  Although not necessary

based upon the court's finding that Parker has no trademark rights to the "Just Dogs" name, the

plaintiff also asserts that Parker cannot establish a likelihood of confusion.  (Doc. 62 at pp.

19-29).  In support of this assertion, Barkery argues that (1) Parker's trademark is legally "weak"

and should be afforded little protection; (2) no likelihood of confusion exists between the two

marks; and (3) the use of each mark does not geographically overlap with the other.[23]

The Eleventh Circuit has recognized the following multi-factor balancing test to establish

the "likely to confuse" element of a trademark infringement and unfair competition claim:

> To determine the likelihood of confusion, the Eleventh Circuit uses a
> seven factor test: (1) the type of mark; (2) the similarity of the marks; (3) the
> similarity of the goods; (4) the identity of customers; (5) similarity of advertising;
> (6) the good or bad intent of defendant; and (7) evidence of actual confusion.

*EBSCO Industries, Inc*., 89 F. Supp. 2d at 1257 (citing *Carnival Brand Seafood*, 187 F.3d at

1311-12).  Although an in-depth analysis of these factors is not necessary given the court's

---

[23]Barkery also asserts that its expert has found that no likelihood of confusion exists.  The expert's testimony (located at document 68-6 (Ex. S)) has not been considered in the court's findings.

finding on the prior use issue, the court will address the type of mark and evidence of actual

confusion simply to show that the defendant would likely not be able to establish a likelihood of

confusion even had he sufficiently shown prior use.

## I.  Type of Mark

Trademarks fit into four categories.  Those categories,

> "[a]rrayed in an ascending order which roughly reflects their eligibility to
> trademark status and the degree of protection accorded . . . are (1) generic,
> (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful."  Before beginning
> analysis, we must acknowledge that placing a mark in one of these four categories
> is far from an exact science, and that the differences between the classes, which is
> not always readily apparent, makes placing a mark in its proper context and
> attaching to it one of the four labels a tricky business at best.

> Generally, generic terms - a common description of goods like "aspirin"
> for example - are ineligible for trademark protection.  Arbitrary marks are eligible
> for protection without proof of secondary meaning and "with ease of establishing
> infringement."  Recognizing that the determination of similarity of marks
> discussed below involves comparison of the marks as composites - not as isolated
> components - the district court properly determined at the preliminary injunction
> stage that Banff's use of the mark "Bee Wear" combines both an arbitrary and a
> generic term, resulting in a suggestive or arbitrary mark entitled to copyright
> protection.

*Banff, LTD v. Federated Department Stores, Inc.*, 841 F.2d 486, 489 (2d Cir. 1988).  In the

instant case, the court finds that "Just Dogs" is made up two generic terms, which, when used

together create a descriptive mark.  "[D]escriptive marks – those that describe the product or its

attributes or claims . . . have little distinctiveness and accordingly are ineligible for protection

unless they have acquired "secondary meaning" – that is, unless the consuming public has come

to associate the mark with the products or services of its user."  *EBSCO Industries*, 89 F. Supp.

2d 1248 (internal citations omitted).

Establishing "Secondary meaning" is no small feat.  The Eleventh Circuit has noted:

> In order to establish secondary meaning the plaintiff must show that the primary significance of the term in the minds of the consumer public is not the product but the producer." *Id.* at 118, quoting *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118, 59 S. Ct. 109, 113, 83 L. Ed. 73 (1938). If the corporate name denotes to the consumer or purchaser "a single thing coming from a single source," then it has acquired secondary meaning. *American Heritage Life Insurance Co. v. Heritage Life Insurance Co.*, 494 F.2d 3, 12 (5th Cir. 1974). The answer depends upon (1) the length and manner of its use; (2) the nature and extent of advertising, promotion and sales; (3) the plaintiff's efforts to promote a conscious connection in the public's mind between the name and the plaintiff's product or business; and (4) the extent to which the public actually identifies the name with the plaintiff's product or venture. *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1513 (11th Cir. 1984). A high degree of proof is necessary to establish secondary meaning for a descriptive term which suggests the basic nature of the product or service. *Vision Center*, 596 F.2d at 118; *American Heritage Life*, 494 F.2d at 12. The existence of secondary meaning is a question of fact and a finding is to be evaluated under the clearly erroneous standard. *Conagra*, 743 F.2d at 1513; *Brooks Shoe Manufacturing Co., Inc. v. Suave Shoe Corp.*, 716 F.2d 854, 860 (11th Cir. 1983); *Volkswagenwerk Aktiengesellschaft v. Rickard*, 492 F.2d 474, 477-78 (5th Cir. 1974).

*American Television and Comm. Corp. v. American Comm. and Television, Inc.*, 810 F.2d 1546, 1549 (11th Cir. 1987). The defendant has not offered any evidence whatsoever tending to show that its name has secondary meaning in any market and certainly not throughout the country.[24]

### ii. Evidence of Actual Confusion

As evidence of actual confusion, the defendant submits emails that he received inquiring about franchise information.[25] The court finds the defendant's cited incidences of confusion inadequate to establish likelihood of confusion in the requisite legal sense. Instances of confusion that are "short-lived, involve[] no customers, and result[] in no loss of sales" are

---

[24]The only aspect of his business that the defendant has shown he has gotten any recognition for is the barking dog compact discs, which are clearly unrelated to the plaintiff's business.

[25]A representative sampling of these email inquiries is as follows: "Are you the company that was shown on the Today show . . . ? . . . If so, I would like to know more . . ."; . . . saw "Just Dogs" franchise on Good Morning America. Can you give me any information?"; "I am interested in information on franchises . . . or any information you could give me on your delightful company." (Doc. 69-2 through 69-3 (Ex. A (Parts I & II))).

28

"worthy of little weight." *American Television*, 810 F.2d at 1550.  Parker has not offered

evidence of any customers being confused or of his sales being affected.  Instead, the "confusion"

came from the plaintiff's potential franchisees.  It is clear that the senders of the emails are

entirely unfamiliar with Parker or his internet business.

Because Parker simply cannot establish an enforceable trademark right or likelihood of

confusion, he likewise cannot establish a claim for unfair competition or false designation of

origin.  *See Freedom Savings and Loan Ass'n v. Way*, 757 F.2d 1176, 1186 (11th Cir. 1985)

(finding unfair competition claim based only upon alleged infringement practically identical to an

infringement claim); *Lipscher v. LRP Publications, Inc.*, 266 F.3d 1305, 1313 (11th Cir.) ("To

prevail on a false designation of origin claim, a plaintiff must show it was either actually or likely

to be damaged by the fact that the defendant used a 'false designation of origin, false or

misleading description of fact, or false or misleading representation of fact, which [wa]s likely to

cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval

of his or her goods, services, or commercial activities by another person.'").  Therefore, Count II

of the defendant's counterclaims is due to be dismissed in its entirety.

### 3.  Counts Three Through Eight

Because the remainder of the defendant's counterclaims require either that the defendant

have a right to the mark or a likelihood of confusion, they are due to be dismissed as well:

### a.  Count Three - Federal Trademark Dilution

5 U.S.C. § 1125(c) entitles the "owner of a famous mark" to an injunction against another

person's . . . use . . . if such use begins after the mark has become famous."  Having already

found that Parker's mark cannot be considered "famous," the court finds that his mark is not

capable of becoming diluted.  Additionally, the court notes that even had it found Parker's mark "famous" or "distinctive," no evidence before  the court suggests that Barkery "willfully intended to trade on [Parker's] reputation or to cause dilution" of his mark.  Accordingly, Parker would not have been entitled to any injunctive relief.

### b.  Count Four - State Law Trademark Infringement

Alabama Code § 8-12-16 is substantially similar to the language of 15 U.S.C. § 1125(a). Having already found that the defendant has failed to establish a claim of federal trademark infringement, the court likewise finds that the defendant has failed to establish a claim of state law trademark infringement for the same reasons.

### c.  Count Five - Common Law Trademark Infringement

The Eleventh Circuit has stated that "[t]he elements of common law and statutory trademark infringement are the same."  *Tally-Ho, Inc. v. Coast Community College District*, 889 F.2d 1018, 1025 (11th Cir. 1990).  Accordingly, the court's reasoning on the plaintiff's statutory trademark infringement claim extends to this claim as well.  It is, therefore, due to be dismissed.

### d.  Count Six - State-Law Trademark Dilution

This claim is due to be dismissed for the same reasons as the federal trademark dilution claim - - absent the presence of a distinctive mark, a claim for dilution cannot exist.

### e.  Count Seven - Deceptive Trade Practices

The defendant asserts that Barkery's use of its mark

tends falsely to represent or designate that the products sold by Barkery are licensed by, sponsored by and/or otherwise affiliated with Parker, or tends falsely to represent . . . that the source of the products sold by Barkery under the "Just Dogs! Gourmet" mark is affiliated, connected with or associated with Parker, when neither Barkery nor its "Just Dogs! Gourmet" products have any connection

30

with or authorization from Parker, and is likely to cause confusion or mistake, or to deceive relevant consumers, as to the origin, sponsorship, association or approval of the products sold by Barkery.  The acts of Barkery complained of herein constitute a violation of the Deceptive Trade Practices Act . . . and have cause [sic] and are causing irreparable harm and damage to Parker for which there is no adequate remedy at law.

      109.    Upon information and belief, Barkery willfully engaged in the conduct complained of herein knowing the same to be deceptive.

      110.    Barkery's deceptive trade practices have and will continue to cause irreparable harm to Parker.  Upon information and belief, and in light of Barkery continuing to use the marks after being informed of the violation, unless enjoined, Barkery will continue the violation, injuring Parker and the public.

(Doc. 19 at pp. 15-16).  Absent a protected mark, the defendant cannot possibly establish a deceptive trade practices claim under ALABAMA CODE § 8-19-5.  This claim is due to be dismissed as well.

### f.  Count Eight - Violation of Anticybersquatting Consumer Protection Act (15 U.S.C. § 1125(d))

The cyberpiracy prevention section protects the owner of a "protected mark."  Having already found that Parker's mark is not protected, the court also finds that Parker cannot establish a claim of cyberpiracy.  That claim is due to be dismissed as well.

### E.  BINDING NATURE OF THE COURT'S FINDINGS

As a part of this action, the plaintiff seeks an order of this court "instruct[ing] the United States Trademark Office and the Trademark Trial and Appeal Board to dismiss the two pending Parker Oppositions and allow Just Dogs currently pending federal trademark applications for the Just Dogs Mark to pass to registration."  (Doc. 62 at p. 31).  The defendant has responded that the plaintiff "has alleged no facts or authority which would provide any basis for instructing the . . . Trademark Office . . . and Trial and Appeal Board to dismiss the two pending Oppositions.

31

The issues of whether the pending applications are suitable and eligible for registration in the . . .
Office is solely an issue for that Office to determine.  (Doc. 71-1 at p. 17).  In its reply, the
plaintiff states that "[t]o the extent that a civil action in a federal district court involves issues in
common with those in a proceeding before the [Board], the decision of the federal district court
is binding upon the Board.  *See, e.g., Goya Foods v. Tropicana Products*, *Inc*., 846 F.2d 848,
854, 6 USPQ 2d 1950, 1955 (2d Cir. 1998).[ ]  In fact, the [Board] acknowledged the federal
district's authority over it in its September 26, 2005 suspension order . . . and clearly
acknowledged that the issues between the opposition proceedings and this civil action overlap
. . . ."  (Doc. 74-1 at p. 13).

Upon a review of the suspension order and relevant authorities, the court does find that a
final order of this court likely would be binding on the Board.  *See American Bakeries Co. v.
Pan-O-Gold Baking Co*., 653 F. Supp. 563, 2 USPQ 2d 1208, 1211 (D. Minn. 1986) ("The
district court, on the other hand, can conclusively determine the issues common to the two
proceedings."); *Whopper-Burger*, *Inc*. *v. Burger King Corp*., 171 USPQQQ 805 (Pat. Off.
TTAAB 1971) ("There can be no doubt therefore that the outcome of the civil action will have a
direct bearing on the question of the rights of the parties herein and may in fact completely
resolve all the issues.").  This is particularly true in this matter as the TTAB Interlocutory
Attorney stated in his opinion staying the proceedings that "[t]he court's findings with regard [to
the trademarks] will have a bearing on opposer's [(Parker's)] likelihood of confusion claim
herein and, more importantly, those findings would be binding upon the Board. . . ."  (Doc. 68-8
(Ex. T)) (citations omitted).  While the court declines to "instruct the United States Trademark
Office and the Trademark Trial and Appeal Board to dismiss the two pending Parker Oppositions

32

and allow Just Dogs currently pending federal trademark applications for the Just Dogs Mark to pass to registration," as the plaintiff requests, the court does direct that its findings be forwarded to the United States Trademark Office and the Trademark Trial and Appeal Board for application in the pending procedures.

## IV. CONCLUSION

Based on the foregoing, the court finds that the defendant's motions to strike (doc. 72 & 76) are due to be denied; the plaintiff's motion for summary judgment on its tortious interference claim (doc. 69) is due to be granted; the defendant's motion for summary judgment on the same claim is due to be denied (doc. 60); and, the plaintiff's motion for summary judgment on the defendant's counterclaims (doc. 61) is due to be granted.

Accordingly, the court further finds as follows:

1. Parker does not have any legally enforceable trademark rights against the plaintiff with respect to its mark;

2. There is no likelihood of confusion between the plaintiff's trademark and the defendant's "mark;"

3. There is no evidence of any cognizable injury to the defendant to support his claims;

4. The defendant is entitled to no monetary or injunctive relief on his counterclaims;

5. The defendant's counterclaims are due to be dismissed with prejudice;

6. The findings in this matter are to be forwarded to the United States Trademark Office and Trademark Trial and Appeal Board for application in the pending proceedings;

7. The case be set for further jury proceedings to determine the amount of damages on the tortious interference claim; and,

8. The case be set for further proceedings to determine the amount of costs and

attorney fees.

An appropriate order will be entered contemporaneously herewith.

**DATED**, this the 10th day of October, 2007.

_John E. Ott_

**JOHN E. OTT**
United States Magistrate Judge